Slip Op. 17-45

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| BORUSAN MANNESMANN BORU SANAYI VE TICARET A.Ş., | : |
| | : |
| *Plaintiff,* | : |
| | : |
| v. | : |
| | : |
| UNITED STATES, | Court No. 14-00009 |
| | : |
| *Defendant,* | : |
| | : |
| and | : |
| | : |
| UNITED STATES STEEL CORPORATION, | : |
| | : |
| *Defendant-Intervenor.* | |

[Granting Plaintiff's Motion for Judgment on the Agency Record and remanding action to agency]

Dated:  April 20, 2017

Brady W. Mills, Morris, Manning & Martin, LLP, of Washington, D.C., for Plaintiff.  With him on the brief were Julie C. Mendoza, Donald B. Cameron, R. Will Planert, Mary S. Hodgins, and Sarah S. Sprinkle.

Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant.  With her on the brief were Joyce R. Branda, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Commercial Litigation Branch, Franklin E. White, Jr., Assistant Director, and Douglas G. Edelschick, Trial Attorney.  Of counsel on the brief was Devin S. Sikes, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Jeffrey D. Gerrish, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, D.C., for Defendant-Intervenor.  With him on the brief were Robert E. Lighthizer and Jamieson L. Greer.

Case 1:14-cv-00009-DAR   Document 82   Filed 04/20/17   Page 2 of 31

# OPINION

RIDGWAY, Judge:

  In this action, Plaintiff Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. ("Borusan") –

a Turkish producer and exporter of standard pipe – contests the final results of the U.S. Department

of Commerce's 2011-2012 administrative review of the antidumping duty order covering welded

carbon steel standard pipe and tube products from Turkey ("standard pipe").[1]  The period of review

is May 1, 2011 through April 30, 2012.  *See* Welded Carbon Steel Standard Pipe and Tube Products

From Turkey: Final Results of Antidumping Duty Administrative Review; 2011-2012, 78 Fed.

Reg. 79,665 (Dec. 31, 2013) ("Final Results"); *see also* Issues and Decision Memorandum for the

Final Results of the Antidumping Duty Administrative Review: Welded Carbon Steel Standard

Pipe and Tube Products from Turkey; 2011-2012 at 2 (Dec. 23, 2013) (Pub. Doc. No. 265) ("Issues

& Decision Memorandum").[2]

---

[1] Previously, this was a consolidated action.  *See* Order (April 8, 2014) (consolidating United States Steel Corp. v. United States, Court No. 14-00036 into this action).  However, U.S. Steel did not file a motion for judgment on the agency record in the consolidated action, and – after the deadline for filing such a motion passed – U.S. Steel filed a consent motion to sever its case (*i.e.*, Court No. 14-00036).  *See* Consent Motion to Sever (Sept. 2, 2014).  That motion was granted.  *See* Order (Sept. 4, 2014) (granting U.S. Steel's motion to sever, reinstating Court No. 14-00036, and directing U.S. Steel to file motion for voluntary dismissal of that case).  U.S. Steel subsequently filed a consent motion to dismiss United States Steel Corp., Court No. 14-00036, which also was granted.  *See* Order (Sept. 5, 2014), *entered in* United States Steel Corp., Court No. 14-00036 (dismissing U.S. Steel's complaint with prejudice).

[2] The administrative record in this action includes both public and confidential (*i.e.*, business proprietary) information.  All documents in the record were filed through IA ACCESS, the Import Administration Antidumping and Countervailing Duty Centralized Electronic Service System.  The record index (like the record) is divided into two sections.  One section consists of public documents and public (*i.e.*, redacted) versions of confidential documents.  The other section consists of unredacted versions of all documents on the record that include confidential

Now pending is Borusan's Motion for Judgment on the Agency Record, which raises a single issue: whether, in calculating Borusan's dumping margin, Commerce properly declined to include in Borusan's duty drawback adjustment "yield loss" – *i.e.*, the "scrap" and "second-quality pipe" that are by-products of the company's production of the standard pipe that it exports to the United States.  *See generally* Brief of Plaintiff Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. ("Borusan") in Support of Its Motion for Judgment Upon the Agency Record at 1-2, 3, 6-9, 10, 31-36 ("Pl.'s Brief"); Reply Brief of Plaintiff Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. ("Borusan") in Response to Defendant's and Defendant-Intervenor's Briefs at 1, 16-22 ("Pl.'s Reply Brief").[3]

Both the Government and Defendant-Intervenor United States Steel Corporation ("U.S. Steel") – a domestic producer of standard pipe – oppose Borusan's motion and maintain that the Final Results are supported by substantial evidence and are otherwise in accordance with law, and therefore must be sustained.  *See generally* Defendant's Response to Plaintiff's Motion for Judgment on the Agency Record at 2, 3-4, 6, 40-43 ("Def.'s Response Brief"); Memorandum in Opposition to Plaintiff's Motion for Judgment on the Agency Record Filed by Defendant-

---

information.  Only documents from the public section of the administrative record are cited in this opinion.  They are cited as "Pub. Doc. No. ___."

[3]Borusan's Complaint sets forth three counts challenging Commerce's Final Results. However, shortly before oral argument, Borusan voluntarily dismissed the first two counts of the Complaint, which contested Commerce's application of the agency's "targeted dumping" analysis. *See* Complaint, Count One (disputing agency determination that Borusan engaged in "differential pricing"); *id*., Count Two (asserting that withdrawal of agency's targeted dumping regulation was unlawful); Consent Motion [of Borusan] to Voluntarily Dismiss Counts One and Two of Plaintiff's Complaint with Prejudice; Order (Oct. 1, 2015) (dismissing with prejudice Counts One and Two). Only Count Three remains at issue in this action.

Intervenor United States Steel Corporation at 1, 4-6, 9, 23-27 ("Def.-Int.'s Response Brief").[4]  In

its brief, the Government argues that Borusan did not demonstrate that it was entitled to a duty

drawback adjustment for yield loss (*i.e.*, scrap and second-quality pipe) because Borusan did not

substantiate its claim with documentary evidence.   Def.'s Response Brief at 2, 6, 40-43.   U.S.

Steel argues that Commerce's determination to exclude scrap and second-quality pipe from

Borusan's duty drawback adjustment is consistent with the plain language of the statute and that

Commerce properly determined that Borusan was not entitled to a duty drawback adjustment for

yield loss, because the scrap and second-quality pipe are not "subject merchandise," because they

were not exported, and because they were sold domestically, on the Turkish market.  Def.-Int.'s

Response Brief at 1, 4-6, 9, 23-27.

Jurisdiction lies under 28 U.S.C. § 1581(c) (2006).[5]  For the reasons set forth below,

Borusan's Motion for Judgment on the Agency Record must be granted, and this matter must be

remanded to Commerce for further consideration.

---

[4]At one point, there were two defendant-intervenors in this action.  Like U.S. Steel, Wheatland Tube Company – a domestic producer of standard pipe – intervened on the side of the Government.  *See* Order (Jan. 29, 2014) (granting Wheatland Tube's consent motion to intervene). Unlike U.S. Steel, however, Wheatland Tube elected not to file a brief in response to Borusan's motion for judgment on the agency record.  Shortly before oral argument, Wheatland Tube sought leave to withdraw, which was granted.  *See* Order (Oct. 7, 2015) (granting Wheatland Tube's consent motion for leave to withdraw from this action).

[5]All citations to statutes herein are to the 2006 edition of the United States Code. The pertinent statutory text remained the same at all times relevant herein.

# I. Background

Understanding the issue presented in this case requires a brief overview of certain aspects of both U.S. antidumping law and Turkish customs law, which are summarized below in the context of the facts of the case.

## A. Overview of the Basic Legal Framework

Dumping and Antidumping Duty Orders.  Dumping is the sale of foreign goods in the United States at "less than fair value."  19 U.S.C. § 1677(34) (defining "dumped" and "dumping"); *see also* United States Steel Corp. v. United States, 621 F.3d 1351, 1360 (Fed. Cir. 2010).  If dumping results in material injury (or the threat of material injury) to the relevant domestic industry, Commerce issues an antidumping duty order imposing antidumping duties on imports of the foreign goods into the United States.  19 U.S.C. § 1673; *see also* Union Steel v. United States, 713 F.3d 1101, 1103 (Fed. Cir. 2013).  The purpose of imposing antidumping duties is to offset any negative effects that dumping may have on the domestic industry.  *See generally* Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d 1041, 1046-47 (Fed. Cir. 2012) (explaining that "dumping presents unfair competition concerns because foreign companies selling goods below fair value can undercut domestic producers selling those same goods at market prices").

Dumping Margin, Normal Value, and Export Price.  The amount of the antidumping duties that are imposed is determined by the "dumping margin," which is "the amount by which the *normal value* exceeds the *export price* . . . of the subject merchandise."  19 U.S.C. § 1677(35) (emphases added); *see also* Nan Ya Plastics Corp. v. United States, 810 F.3d 1333, 1337 (Fed. Cir. 2016) (same).  The "normal value" of merchandise is generally the price that a foreign producer

charges in its home market, while the "export price" is most often the price that the producer

charges in the United States.  19 U.S.C. §§ 1677a, 1677b; *see also* <u>Nan Ya Plastics Corp.</u>, 810

F.3d at 1337 (stating that dumping margin is the amount by which the price a producer charges in

its home market (*i.e.*, normal value) exceeds the price of the product in the U.S. (*i.e.*, export price))

(citing <u>United States Steel Corp.</u>, 621 F.3d at 1353).

    <u>Adjustments to Normal Value and Export Price</u>.  In order to ensure a fair, "apples-to-

apples" comparison between normal value and export price, the statute directs Commerce to make

certain "adjustments" to both.  *See* 19 U.S.C. § 1677a(c) (specifying adjustments to be made to

export price, including "duty drawback adjustment"); 19 U.S.C. §1677b(a)(6) (specifying

adjustments to be made to normal value); *see also* <u>Fla. Citrus Mutual v. United States</u>, 550 F.3d

1105, 1110 (Fed. Cir. 2008) (explaining that purpose of adjustments is to achieve a fair comparison

"between U.S. price [*i.e.*, export price] and foreign market value [*i.e.*, normal value]").  At issue

in this action is the "duty drawback adjustment" – *i.e.*, an upward adjustment to export price that

Commerce is statutorily required to make as part of its antidumping analysis, in order to account

for a foreign producer's receipt of any "duty drawback" under the laws of another country.  *See* 19

U.S.C. § 1677a(c)(1)(B).

    <u>Duty Drawback</u>.  "Duty drawback" is a long-standing tool used by countries around the

world to encourage export production.  *See generally*, *e.g.*, Susan G. Markel, "Tax and Duty

Incentives," in <u>Export Practice</u>, 371, 391-92 (Terence P. Stewart ed., 1994) (providing overview

of duty drawback program in the U.S.).  In general, under a duty drawback program, a country

either exempts from import duties – or refunds (*i.e.*, rebates) import duties that were paid at the

time of entry for – goods (*e.g.*, material inputs or components) that are imported into the country

and used to produce merchandise that is then subsequently exported from the country.  Depending

on the country, the exemption or refund/rebate offered under a duty drawback program may cover

all, or just a portion, of the import duties that would otherwise apply.[6]  A country's establishment

of a duty drawback program promotes and incentivizes production for exportation, because duty

drawback allows businesses in the country to compete in foreign markets without the handicap of

including in their sales prices import duties that the companies otherwise would have been required

to pay on imported material inputs or components.  *See generally id*. at 392.  (As discussed below,

when Borusan imported into Turkey quantities of material inputs essential to the company's

production of standard pipe, Borusan availed itself of Turkey's duty drawback laws.  *See generally*

*infra* section I.B.)

 Duty Drawback Adjustment.  In calculating a foreign producer's dumping margin, to

ensure an "apples-to-apples" comparison between normal value and export price, Commerce must

– through a "duty drawback adjustment" – account for any duty drawback that the foreign producer

received pursuant to the duty drawback program in its home country.  Specifically, Commerce is

directed by statute to increase the export price by "the amount of any import duties imposed by

the country of exportation which have been rebated, or which have not been collected, by reason

of the exportation of the subject merchandise to the United States."  19 U.S.C. § 1677a(c)(1)(B);

*see also* Saha Thai Steel Pipe (Public) Co. v. United States, 635 F.3d 1335, 1338 (Fed. Cir. 2011)

---

 [6]In the United States, for example, a domestic manufacturer may obtain drawback of 99% of duties paid on inputs or components that are imported into the U.S. and further processed or assembled and then subsequently exported.  *See generally* U.S. Customs and Border Protection, What Every Member of the Trade Community Should Know About: Drawback at 7 (Dec. 2004).

(summarizing duty drawback adjustment statute).[7]  Like any adjustment that increases the export

price, a duty drawback adjustment (in effect) lowers the foreign producer's dumping margin.

    The purpose of the duty drawback adjustment – *i.e.*, the upward adjustment made to the

export price pursuant to 19 U.S.C. § 1677a(c)(1)(B) – is to prevent a dumping margin from being

created, or artificially inflated, because the exporting country exempts from import duties (or

refunds/rebates import duties paid on) material inputs or components that are imported into the

country and used to produce a product that is subsequently exported.  *See generally*, *e.g.*,

Wheatland Tube Co. v. United States, 30 CIT 42, 60, 414 F. Supp. 2d 1271, 1286 (2006), *rev'd on*

*other grounds*, 495 F.3d 1355 (Fed. Cir. 2007); Allied Tube & Conduit Corp. v. United States, 29

CIT 502, 506, 374 F. Supp. 2d 1257, 1261 (2005); Hornos Electricos de Venezuela, S.A. v. United

States, 27 CIT 1522, 1525, 285 F. Supp. 2d 1353, 1358 (2003) ("HEVENSA"); Far East Mach.

Co. v. United States, 12 CIT 428, 430-31, 688 F. Supp. 610, 611 (1988); Carlisle Tire & Rubber

Co. v. United States, 10 CIT 301, 307, 634 F. Supp. 419, 424 (1986).[8]

---

[7]In deciding whether a foreign producer or other respondent is entitled to a duty drawback adjustment, Commerce applies a two-prong test, which requires the respondent to demonstrate that: "(1) the rebate and import duties are dependent upon one another, or in the context of an exemption from import duties, that the exemption is linked to the exportation of the subject merchandise; and (2) that there are sufficient imports of the raw material to account for the duty drawback on the exports of the subject merchandise."  Saha Thai, 635 F.3d at 1340 (quoting Saha Thai Steel Pipe (Public) Co. v. United States, 33 CIT 1541, 1542 (2009)); *see also* 2015 Enforcement and Compliance Antidumping Manual, Chapter 7: Export Price and Constructed Export Price at 10-11 (explaining adjustments to export price required by the statute).  As with all adjustments to normal value or export price that favor respondents, the respondent bears the burden of demonstrating that both prongs of Commerce's test are satisfied, thereby establishing the respondent's entitlement to a duty drawback adjustment.  Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1040 (Fed. Cir. 1996).

[8]Duty drawback adjustments have long been a part of U.S. trade law.  *See generally* S. Rep. No. 67-16, at 12 (1921) (stating that it is necessary to add to the exporter's sales price "any

Duty drawback adjustments thus account for the fact that producers do not have to factor import duty into their prices for their merchandise when it is sold *in foreign markets*, but "the producers remain subject to the import duty when they sell the subject merchandise *domestically*, which increases home market sales prices and thereby increases [normal value]." Saha Thai, 635 F.3d at 1338 (emphasis added); *see also id*. at 1342 (stating that "the entire purpose of increasing [export price through the duty drawback adjustment] is to account for the fact that the import duty costs are reflected in [normal value] (home market sales prices) but not in [export price] (sales prices in the United States")).[9]   In other words, as the Court of Appeals has explained, when duty drawback is granted only for an imported input that is used to produce merchandise that is later exported (and *not* merchandise sold domestically), the cost of the import duty is reflected in normal value but not in export price.  *Id*., 635 F.3d at 1338.  "The statute corrects this imbalance, which could otherwise lead to an inaccurately high dumping margin" – or even a false finding of dumping when dumping is not actually occurring.  *Id*.; *see also*, *e.g*., Wheatland Tube Co., 30 CIT at 60, 414 F. Supp. 2d at 1286 (explaining that "[t]he duty drawback adjustment is intended to prevent

---

drawback given by the country of exportation upon the exportation of the merchandise, or any excise tax which is refunded or not collected upon the exportation" in order that the sale does not overstate or wrongly constitute dumping).

[9]Stated differently, Congress provided for the duty drawback adjustment "because purchasers in the home market presumably must pay the passed on cost of import duties [paid on imported inputs used to produce the merchandise] when they buy the merchandise." Huffy Corp. v. United States, 10 CIT 214, 215-16, 632 F. Supp. 50, 52 (1986).  On the other hand, "[i]f the duties are rebated [or if the inputs are exempt from import duties] when the merchandise is exported [to the United States], presumably no similar cost is passed on to purchasers in the United States.  By adding the amount of the rebate [or exemption] to [the export price] . . . this adjustment accommodates the difference in cost to the two different purchasers."  *Id*.

dumping margins from being *created or affected by* the rebate or exemption of import duties on inputs used in the production of exported merchandise") (emphasis added).

In sum, the purpose of the duty drawback adjustment is to correct the "imbalance" between the price charged for subject merchandise in the producer's home market (which presumably reflects duties paid on imported inputs) and the price charged in the United States (where the producer received either a duty rebate on imported inputs or an exemption from duties on the inputs because the subject merchandise was exported). The duty drawback adjustment to export price serves to "offset" import duties that are reflected in normal value, and thus permits a fair comparison to be made between normal value and export price, eliminating a potential source of distortion in Commerce's antidumping analysis. *See* Carlisle Tire & Rubber Co., 10 CIT at 307, 634 F. Supp. at 424 (describing duty drawback adjustment as "an offsetting adjustment" in the calculation of normal value, designed "[t]o prevent dumping margins from arising because the exporting country rebates import duties . . . for raw materials used in exported merchandise"); Wheatland Tube Co., 30 CIT at 46, 414 F. Supp. 2d at 1275 (noting argument that rationale for duty drawback adjustment is "to offset duties that are paid on inputs used in the production of merchandise sold in the home market").

As the Court of Appeals has repeatedly underscored, "[a]n overriding purpose of Commerce's administration of [the] antidumping laws is to calculate dumping margins *as accurately as possible*." Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1379 (Fed. Cir. 2013) (emphasis added) (citing Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990)). Ultimately, the duty drawback adjustment helps ensure that Commerce does exactly that.

B.  <u>The Facts of This Case</u>

The antidumping duty order covering imports of standard pipe from Turkey dates back

roughly three decades, to 1986.  *See* Antidumping Duty Order; Welded Carbon Steel Standard

Pipe and Tube Products from Turkey, 51 Fed. Reg. 17,784 (May 15, 1986).  "Once an antidumping

duty order . . . is in place, 'Commerce periodically reviews and reassesses antidumping duties'

during administrative reviews."  <u>Dongtai Peak Honey Industry Co. v. United States</u>, 777 F.3d

1343, 1349 (Fed. Cir. 2015) (quoting <u>Gallant Ocean (Thai.) Co. v. United States</u>, 602 F.3d 1319,

1321 (Fed. Cir. 2010)).  This action contests the Final Results of the 2011-2012 administrative

review, where Commerce calculated Borusan's weighted-average dumping margin to be 1.79%.

Final Results, 78 Fed. Reg. at 79,666.  That dumping margin did not include the duty drawback

adjustment that Borusan sought for "yield loss."  *Id.*; Issues & Decision Memorandum at 18-19

(Comment 4).  Commerce's decision to deny Borusan a duty drawback adjustment for yield loss

is the subject of Borusan's claim here.

The relevant facts are straightforward and not in dispute.  Borusan produces standard pipe

in Turkey, using as its primary material input hot-rolled steel coil which the company imports into

Turkey in accordance with the terms of that country's duty drawback program.  Borusan's

Response to Commerce's Initial Questionnaire – Sections B & C at C-35 (Oct. 9, 2012) (Pub. Doc.

No. 57) ("Borusan's Initial Questionnaire Responses").[10]  To account for the phenomenon known

---

[10]The administrative record includes an English translation of the duty drawback regulation
in effect in Turkey during the period of review.  *See* Borusan's Initial Questionnaire Responses at
C-35, Ex. C-7; see also *id*. at C-36 to C-37, Ex. C-10 (official announcement of modification to
Turkish duty drawback program, dated May 31, 2010, making the domestic sale of by-products
such as the scrap and second-quality pipe at issue here subject to import duties and value-added

as "yield loss," Turkey's duty drawback law allows Borusan to obtain an exemption from import

duties for a volume of hot-rolled steel coil that is greater than the volume of standard pipe that the

company subsequently exports.  Borusan's Response to Commerce's Supplemental Questionnaire

---

tax ("VAT") at the rate in effect for imports of the specific by-products in question, as if they had
been imported into Turkey).

       Under Turkish duty drawback law, to be eligible for an exemption from import duties on
imported raw materials that are used to produce finished exported products, an exporter must apply
for and obtain an Internal Processing Permit Certificate ("Internal Processing Certificate") from
Turkey's Undersecretariat of Foreign Trade.  On the application form, the exporter must specify
the total volume of imported raw material that is required to produce the volume of finished
products that the exporter plans to export.  In addition, the exporter also must submit a "Letter of
Export Commitment," stating that the imported raw materials will be used to produce goods for
export and acknowledging that failure to do so would subject the exporter to penalties.  The
specific duration of an Internal Processing Certificate depends on the industry and may be
extended under certain circumstances.

       After the Internal Processing Certificate is issued, the producer/exporter must show it to
Turkish customs authorities each time the company imports raw materials on a duty-exempt basis.
The Turkish authorities stamp the entry documents to indicate that the entry is being made on a
duty-exempt basis.   In addition, the producer/exporter must indicate on customs export
documentation whether a particular exportation of the finished product is being used to meet the
exporter/producer's obligation under the Internal Processing Certificate to export a specified
volume of the finished product (relative to the volume of imported raw materials claimed to be
imported for use in the production of the finished product).

       At the end of the period covered by the Internal Processing Certificate, the
producer/exporter must submit certain documents to the Secretary General of the applicable
Exporter's Union for inspection and review.  The requisite documents include the original customs
import and export declaration forms, the import list, the export list, and a raw material balancing
table.  The Secretary General of the Exporter's Union reviews the documentation to verify that the
volume of finished product that was exported was sufficient to have required the volume of raw
materials that was imported duty-free.  The Secretary General of the Exporter's Union then issues
a closing confirmation letter to the producer/exporter.   To be granted duty drawback, the
producer/exporter submits the relevant Internal Processing Certificate and the associated closing
documents to the Turkish authorities for approval.  *See generally* Borusan's Initial Questionnaire
Responses at C-35 to C-37 (summarizing operation of Turkey's duty drawback program).

– Sections A-C at C-29 (Feb. 19, 2013) (Pub. Doc. No. 158) ("Borusan's Supp. Questionnaire Responses"); Borusan's Initial Questionnaire Responses at C-37 to C-39; *see also* Pl.'s Brief at 6, 32-33; Pl.'s Reply Brief at 19.  As Borusan explains (using a simplified example), the company "may need to import 1.1 metric tons of [hot-rolled steel] coil in order to produce 1 metric ton of finished standard pipe."  Pl.'s Brief at 33; *see also* Pl.'s Reply Brief at 19.  In that example, the difference between the 1.1 metric tons of hot-rolled steel coil and the 1.0 metric ton of finished standard pipe is the "yield loss."  Pl.'s Brief at 6, 33; Pl.'s Reply Brief at 19; *see also* Borusan's Supp. Questionnaire Responses at C-29.[11]

The yield loss that results from Borusan's production of standard pipe consists of "scrap" and "second-quality pipe."  Borusan's Initial Questionnaire Responses at C-36 to C-37; Borusan's Supp. Questionnaire Responses at C-28 to C-29.  After the production process is complete, Borusan exports the standard pipe to the United States (among other countries) and sells the yield loss – *i.e.*, the scrap and second-quality pipe – domestically, on the Turkish market.  Borusan's Initial Questionnaire Responses at C-37; Borusan's Supp. Questionnaire Responses at C-28 to C-29.

Turkish customs authorities historically and consistently have granted Borusan duty drawback for the entire volume of hot-rolled steel coil that Borusan imports into Turkey in order to produce a corresponding volume of standard pipe for exportation.  *See* Borusan's Initial Questionnaire Responses at C-37 to C-39; Borusan's Supp. Questionnaire Responses at C-29 to C-30; Pl.'s Brief at 6, 32-33; Pl.'s Reply Brief at 19-20.  In addition, until the period covered by

---

[11]Yield loss can result from, for example, drying or evaporation, or as a result of manufacturing processes (as it does in the case of Borusan's production of standard pipe).

the administrative review here, there were no duties or additional taxes imposed on Borusan's

domestic (Turkish) sales of the scrap and second-quality pipe that are by-products of Borusan's

manufacture of standard pipe for export.  Borusan's Initial Questionnaire Responses at C-36 to C-

37.

In 2010, the Turkish government modified its duty drawback program, announcing that the

domestic sale of by-products and scrap produced under an Internal Processing Certificate would

be subject to import duties and value-added tax ("VAT") at the rate in effect for imports of the

specific by-products or scrap in question (*i.e.*, as if the by-products or scrap had been imported

into Turkey).  *See* Borusan's Initial Questionnaire Responses at C-36 to C-37, Ex. C-10; Borusan's

Supp. Questionnaire Responses at C-29.  As a result, Borusan is now required by Turkish law to

declare the volume of steel scrap and second-quality pipe that results from its manufacture of

standard pipe pursuant to Turkey's duty drawback program.  *See* Borusan's Initial Questionnaire

Responses at C-37; Borusan's Supp. Questionnaire Responses at C-29.  Under Turkish customs

law, however, the import duty rate applicable to imports of scrap and second-quality pipe was 0%

throughout the period at issue here.  *See* Borusan's Initial Questionnaire Responses at C-37;

Borusan's Supp. Questionnaire Responses at C-29.[12]

As a practical matter, the entire volume of hot-rolled steel coil that Borusan imported into

Turkey for its production of standard pipe for export to the United States during the 2011-2012

---

[12]Under Turkish law, throughout the period at issue here, there was no VAT on domestic
sales of steel scrap.  Although there was a VAT on domestic sales of second-quality pipe, Borusan
passed it through to the company's customers.  Thus, Borusan explains, "the VAT is a 'wash'
transaction" for the company and "the net effect . . . [is that] the new regulation . . . [made] no
change in the real costs" that Borusan incurred.  Borusan's Initial Questionnaire Responses at C-
37; *see also* Pl.'s Brief at 7.  In any event, the treatment of VAT is not at issue in this action.

period was exempted from import duties by Turkish customs authorities, pursuant to Turkey's

duty drawback program.[13]  The Turkish customs authorities imposed no import duties on the steel

coil when it was entered into Turkey; and no import duties were imposed on the steel coil when

Borusan exported the subject standard pipe, even though the scrap and second-quality pipe that

resulted from the company's production of standard pipe were not exported and, in fact, were sold

domestically, on the Turkish market.  Borusan's Initial Questionnaire Responses at C-37 to C-39;

Borusan's Supp. Questionnaire Responses at C-29 to C-30; *see also* Pl.'s Brief at 6, 32-33; Pl.'s

Reply Brief at 16-17, 19, 20.

In administrative reviews of the antidumping duty order on standard pipe from Turkey

prior to the 2011-2012 review at issue, Commerce's duty drawback adjustment for Borusan has

uniformly reflected the fact that Turkey grants the company duty drawback on the entire volume

of hot-rolled steel coil that Borusan imports for its production of standard pipe for export.  In other

words, in the past, Commerce has not reduced Borusan's duty drawback adjustment to account for

the fact that the process of producing standard pipe yields scrap and second-quality pipe that are

not physically incorporated into the standard pipe that Borusan exports.  Nor has Commerce

reduced Borusan's duty drawback adjustment to account for the fact that Borusan did not export

the scrap and second-quality pipe, and, in fact, sold them domestically, on the Turkish market.  *See*

*generally* Borusan's Initial Questionnaire Responses at C-39 & n.4 (stating that Borusan's duty

drawback adjustment calculation including yield loss proffered in the instant administrative review

used "the same methodology verified and accepted by [Commerce] in numerous Turkish

---

[13]At least for 2011-2012, the duty rate applicable to hot-rolled coil under Turkish customs law was 9% *ad valorem*.  *See* Borusan's Initial Questionnaire Responses at C-39, Ex. C-7.

antidumping cases"); Borusan's Supp. Questionnaire Responses at C-29; *see also* Pl.'s Brief at 32,

34; Pl.'s Reply Brief at 20, 21-22.

In the Final Results of the 2011-2012 administrative review, Commerce – for the first time

– declined to include scrap and second-quality pipe in Borusan's duty drawback adjustment.   In

its entirety, Commerce's explanation for that determination (as set forth in the agency's Issues &

Decision Memorandum) states:

> We agree with U.S. Steel that [in the Preliminary Results, Commerce] erroneously
> incorporated yield loss factors relating to scrap and second-quality pipe in making
> Borusan's duty drawback adjustment.   In the Preliminary Results, [Commerce]
> used Borusan's reported [duty drawback] field that accounted for the yield loss
> factors for scrap and second-quality pipes.  Although it did not export the scrap and
> second-quality pipe, Borusan claimed that it did not pay regular import duties on
> that portion of the coil that represents the yield loss on the finished, prime product
> because it exports the finished, prime product.  This was in error because, under
> Turkish law, the scrap and second-quality pipe that are not re-exported are, in fact,
> "subject to import duty . . . at the rate in effect for imports of the specific by-
> products . . . as if the by-products or scrap had been imported into Turkey."
> Therefore, [Commerce] will not incorporate yield loss factors related to scrap and
> second-quality pipe in making Borusan's duty drawback adjustment in these final
> results.

Issues & Decision Memorandum at 18-19 (footnotes, consisting of citations only, omitted).

This action ensued.

## II.  Standard of Review

In an action reviewing an antidumping determination by Commerce, the agency's

determination must be upheld except to the extent that it is found to be "unsupported by substantial

evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i);

*see also* NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009).  Substantial

evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S.

474, 477 (1951) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); *see also*

Dongtai Peak Honey Industry Co., 777 F.3d at 1349 (same).

     Moreover, any determination as to the substantiality of the evidence "must take into

account whatever in the record fairly detracts from its weight," including "contradictory evidence

or evidence from which conflicting inferences could be drawn." Suramerica de Aleaciones

Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting Universal Camera

Corp., 340 U.S. at 487-88); *see also* CS Wind Vietnam Co. v. United States, 832 F.3d 1367, 1373

(Fed. Cir. 2016) (same).  That said, the mere fact that it may be possible to draw two inconsistent

conclusions from the record does not prevent Commerce's determination from being supported by

substantial evidence.  Dongtai Peak Honey Industry Co., 777 F.3d at 1349 (citing Consolo v. Fed.

Maritime Comm'n, 383 U.S. 607, 620 (1966)).

     In addition, while Commerce must explain the bases for its decisions, "its explanations do

not have to be perfect." NMB Singapore Ltd., 557 F.3d at 1319-20.  Commerce's rationale

nevertheless must address the parties' principal arguments; and, more generally, "the path of

Commerce's decision must be reasonably discernable" in order to support judicial review. *Id.*

(citing Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Automobile Ins. Co., 463

U.S. 29, 43 (1983)); 19 U.S.C. § 1677f(i)(3)(A) (requiring Commerce to "include in a final

determination . . . an explanation of the basis for its determination that addresses relevant

arguments, made by interested parties"); *see generally* CS Wind Vietnam Co., 832 F.3d at 1375-

81 (highlighting agency's "obligation to set forth a comprehensible and satisfactory justification

Case 1:14-cv-00009-DAR   Document 82   Filed 04/20/17   Page 18 of 31

for its [determination] . . . as a reasonable implementation of statutory directives supported by substantial evidence," and analyzing that obligation in depth).

Further, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." State Farm, 463 U.S. at 50; *see also* Changzhou Wujin Fine Chemical Factory Co. v. United States, 701 F.3d 1367, 1377, 1379 (Fed. Cir. 2012) (citations omitted) (same); Home Prods. Int'l, Inc. v. United States, 633 F.3d 1369, 1381 (Fed. Cir. 2011) (citing, *inter alia*, Abbott Labs. v. United States, 573 F.3d 1327, 1332-33 & n.1 (Fed. Cir. 2009)) (same). An agency's determination thus cannot be sustained on the basis of a rationale supplied after the fact – whether by the agency's litigation counsel, by another party, or by the court. *See* Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962); *see also* Home Prods. Int'l, 633 F.3d at 1381 (citing Abbott Labs., 573 F.3d at 1332-33 & n.1 (same); Bowen v. Georgetown Univ. Hospital, 488 U.S. 204, 213 (1988)); Changzhou Wujin Fine Chemical Factory Co., 701 F.3d at 1379 (citation omitted) (same).

## III. <u>Analysis</u>

Borusan contests Commerce's decision to exclude yield loss (*i.e.*, scrap and second-quality pipe) from the duty drawback adjustment in calculating the company's dumping margin. In essence, Borusan contends that Commerce's exclusion of scrap and second-quality pipe from the duty drawback adjustment results in an "imbalance" between export price and normal value, which – in turn – artificially inflates the company's dumping margin. *See* Pl.'s Brief at 1-2, 3, 6-9, 10, 31-36; Pl.'s Reply Brief at 1, 16-22; Saha Thai, 635 F.3d at 1338 (explaining that purpose of duty drawback adjustment is to correct "imbalance" between export price and normal value that would

result if duty drawback received by an importer were not added to export price in agency's calculation of dumping margin).

As detailed below, Commerce's Issues & Decision Memorandum fails to address Borusan's main argument, misstates Turkish customs law, and otherwise fails to adequately explain the agency's decision. Moreover, the arguments that the Government and U.S. Steel make in an effort to prop up Commerce's determination are *post hoc* rationale. *See generally* Def.'s Response Brief at 2, 3-4, 6, 40-43; Def.-Int.'s Response Brief at 1, 4-6, 9, 23-27. As such, the path of Commerce's reasoning in deciding to exclude scrap and second-quality pipe from Borusan's duty drawback adjustment is not "reasonably . . . discernable." *See* State Farm, 463 U.S. at 43. And, absent an adequate explanation of Commerce's reasoning, it is not possible to conduct a "substantial evidence" review or to analyze whether the agency's determination is in accordance with the statute.

Remand is therefore necessary to allow Commerce to reconsider this issue and to clearly explain whatever determination it may reach.

## A. Borusan's Arguments

There are several significant deficiencies in Commerce's stated bases for denying Borusan a duty drawback adjustment for its yield loss (*i.e.*, the scrap and second-quality pipe that result from Borusan's production of the standard pipe that it exports to the U.S.). In relevant part, the Issues & Decision Memorandum states: "Although it did not export the scrap and second-quality pipe, Borusan claimed that it did not pay regular import duties on that portion of the coil that represents the yield loss on the finished, prime products because it exports the finished, prime

product.  This was in error because, under Turkish law, the scrap and second-quality pipe that are not re-exported are, in fact, 'subject to import duty . . . at the rate in effect for imports of the specific by-products . . . as if the by-products or scrap had been imported into Turkey.'"  Issues & Decision Memorandum at 19.

As Borusan emphasizes, however, the company's principal argument throughout the administrative review was that the duty rate applicable to scrap and second-quality pipe during the 2011-2012 period of review was 0%.   Thus, Borusan states, the amount of duty drawback that Turkey granted to Borusan was unaffected by the 2010 modification to Turkey's duty drawback program, which subjects by-products such as scrap and second-quality pipe to import duty at the rate applicable to those by-products as if they had been imported into Turkey, if the by-products are sold on the domestic (Turkish) market.  *See* Pl.'s Brief at 7, 10, 34-36; Pl.'s Reply Brief at 16-17, 18-20, 22.  Yet, in explaining Commerce's decision to exclude scrap and second-quality pipe from Borusan's duty drawback adjustment, the Issues & Decision Memorandum inexplicably fails to make any mention of the 0% duty rate.  *See* Issues & Decision Memorandum at 18-19.

Commerce is obligated by statute to "include in [its] final determination . . . an *explanation* of the basis for its determination *that addresses relevant arguments*, *made by interested parties*." 19 U.S.C. § 1677f(i)(3)(A) (emphases added); *see* Timken U.S. Corp. v. United States, 421 F.3d 1350, 1351, 1356 (Fed. Cir. 2005) (discussing statutory directive); NMB Singapore Ltd., 557 F.3d at 1320 (same); Husteel Co. v. United States, 39 CIT ____, ____, 98 F. Supp. 3d 1315, 1331 (2015), *appeal docketed*, No. 2016-2732 (Sept. 29, 2016) (observing that "Commerce has a general duty to explain the basis for its decisions," which "includes addressing relevant arguments made by interested parties") (citing NMB Singapore Ltd., 557 F.3d at 1319-20); *see generally* State

Farm, 463 U.S. at 48-49 ("reaffirm[ing]" the fundamental principle that "an agency must cogently explain why it has exercised its discretion in a given manner") (citing Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade, 412 U.S. 800, 806 (1973); FTC v. Sperry & Hutchinson Co., 405 U.S. 233, 249 (1972); NLRB v. Metropolitan Life Ins. Co., 380 U.S. 438, 443 (1965)).

In Amerijet, the U.S. Court of Appeals for the D.C. Circuit recently underscored the importance of an agency's obligation to "articulate an explanation for its action": "[A] 'fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action.'" Amerijet Int'l, Inc. v. Pistole, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (referring to the requirement that an agency adequately explain its decision as a "basic principle" that is "indispensable to sound judicial review") (quoting Tourus Records, Inc. v. DEA, 259 F.3d 731, 737 (D.C. Cir. 2001)).  Amerijet further noted that "conclusory statements will not do; an 'agency's statement must be one of reasoning.'" Amerijet Int'l, Inc., 753 F.3d at 1350 (emphasis added) (quoting Butte Cty. v. Hogen, 613 F.3d 190, 194 (D.C. Cir. 2010)); see generally CS Wind Vietnam Co., 832 F.3d at 1376-77, 1379-81 (discussing at length and in great detail Commerce's obligation to supply adequate explanations for its determinations; stating, inter alia, that the agency's explanation for a determination "must reasonably tie the determination under review to the governing statutory standard and to the record evidence by indicating what statutory interpretations the agency is adopting and what facts the agency is finding").

Much like the flawed agency rationale at issue in Amerijet, Commerce's explanation in the Issues & Decision Memorandum here "does not address the main thrust" of Borusan's argument in support of its claim for a duty drawback adjustment on yield loss – i.e., Borusan's argument

that, under Turkish customs law, the duty rate applicable to scrap and second-quality pipe is 0%.

*See* Amerijet Int'l, Inc., 753 F.3d at 1351-52.  As a result, much like the situation in Amerijet, it is

impossible here to "discern if [Commerce] considered the substance of [Borusan's] request and, if

so, what reasons it had for denying it."  *Id.*

    The bottom line is that, in its Issues & Decision Memorandum, "Commerce essentially

ignored [Borusan's] argument[]" concerning the 0% duty rate.  *See* Husteel Co. 39 CIT at ____,

98 F. Supp. 3d at 1331.[14]  Commerce thus contravened its basic duty under the statute to ensure

---

[14]At oral argument, the Government emphasized that the footnotes to Commerce's explanation in the Issues & Decision Memorandum cite Borusan's questionnaire responses.  The Government further emphasized that Borsuan's questionnaire responses, in turn, state that – under Turkish customs law – the duty rate applicable to scrap and second-quality pipe is 0%.  The Government contends that the footnotes in the Issues & Decision Memorandum (and the footnotes' bare citations to Borusan's submissions) suffice to discharge Commerce's statutory obligation to acknowledge and address Borusan's argument based on the 0% duty rate.

The Government's argument grasps at straws.  In effect, the footnotes to Commerce's explanation in the Issues & Decision Memorandum (at best) incorporate by reference, and constitute a restatement of, Borusan's position.  The footnotes do nothing to illuminate Commerce's rationale for its decision to deny Borusan a duty drawback adjustment for scrap and second-quality pipe.  In effect, the submissions cited in the footnotes set forth Borusan's position.  As such, references to those submissions contribute nothing to the substance of Commerce's explanation.  Merely restating a party's position does not fulfill an agency's obligation to grapple with the party's main arguments and to adequately explain the reasoning that underpins the agency's determination.  *See generally*, *e.g.*, Amerijet Int'l, Inc., 753 F.3d at 1351 (rejecting as inadequate an agency's proffered explanation which "simply restated the rules from which [a party] sought exception," and observing that "[r]estating a rule from which an exception is sought explains nothing about *why* the agency denied the exception; it begs the question").

In addition, a basic tenet of civil and appellate procedure is that "arguments raised in footnotes are not preserved."  SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1320 (Fed. Cir. 2006) (citations omitted).  A reasonable corollary would preclude an agency from burying in a footnote some essential aspect of the rationale for the agency's determination.

that its explanation for its determination "addresses relevant arguments, made by interested

parties." 19 U.S.C. § 1677f(i)(3)(A).  Remand would be warranted for this reason alone.[15]

There is, however, at least one additional problem with Commerce's reasoning as set forth

in the Issues & Decision Memorandum.  Commerce fundamentally misstates the relevant Turkish

customs law.  Specifically, in the Issues & Decision Memorandum, Commerce asserts that, "under

Turkish law, the scrap and second-quality pipe that are not re-exported are, in fact, 'subject to

import duty . . . at the rate in effect for imports of the specific by-products . . . as if the by-products

or scrap had been imported into Turkey.'"  Issues & Decision Memorandum at 19.  Significantly,

Commerce's summary of Turkish law thus omits the pivotal concept of domestic sale.  Contrary

to Commerce's assertion, under Turkish law, whether scrap and second-quality pipe are subject to

import duty does not turn on whether or not they are exported from Turkey.  Instead, the key

consideration is whether scrap and second-quality pipe that is not exported is *sold domestically*,

---

[15]Further, as set forth in section II above, it is hoary black letter law that any analysis of
the substantiality of evidence "must take into account whatever in the record fairly detracts from
its weight," including "contradictory evidence or evidence from which conflicting inferences could
be drawn."  Suramerica de Aleaciones Laminadas, C.A., 44 F.3d at 985 (quoting Universal Camera
Corp., 340 U.S. at 487-88); *see also* Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375,
1380-81 (Fed. Cir. 2008) (same).  Moreover, "an agency 'must address significant arguments and
evidence which seriously undermine[] its reasoning and conclusions.'"  Husteel Co., 39 CIT at
____, 98 F. Supp. 3d at 1359 (quoting Altx, Inc. v. United States, 25 CIT 1100, 1117-18, 167 F.
Supp. 2d 1353, 1374 (2001)).

By ignoring Borusan's argument emphasizing the 0% duty rate applicable to scrap and
second-quality pipe under Turkish customs law, Commerce failed to take into account arguments
and evidence that "fairly detract" from both the agency's determination and the evidence on which
that determination is based.  In addition, Commerce failed to address a significant argument and
evidence that "seriously undermine" the agency's reasoning and conclusions.  Accordingly, on the
existing record, it cannot be said that Commerce's decision to deny Borusan a duty drawback
adjustment for scrap and second-quality pipe is supported by substantial evidence.  Remand would
be justified on these grounds as well.

*on the Turkish market*.  In other words, even if scrap and second-quality pipe are not exported, Turkish customs law nevertheless does not subject them to import duty, unless they are the subject of domestic sales (and, even then, the applicable duty rate is 0%).

In the course of oral argument, the Government argued that, although Commerce's statement of Turkish law is incomplete, it is not inaccurate because, in this case, Borusan did sell the scrap and second-quality pipe on the Turkish market.  Under the circumstances presented here, however, a clearer statement of Commerce's position is required.

From the Issues & Decision Memorandum, it is simply impossible to know whether or not Commerce fully understood applicable Turkish law at the time the agency made its determination. Even more to the point, from a reading of the Issues & Decision Memorandum, it is impossible to state definitively whether Commerce's position is that the scrap and second-quality pipe at issue should not be included in Borusan's duty drawback adjustment because they were not exported, or whether Commerce's position is that the scrap and second-quality pipe should not be included in the duty drawback adjustment because Borusan sold them on the Turkish domestic market, or whether Commerce's position is that the scrap and second-quality pipe should not be included in the duty drawback adjustment because they are subject to import duty under Turkish customs law – albeit at a rate of 0%.[16]  In sum, just as Commerce's failure to acknowledge and address

---

[16]Borusan observes that it would be more than passing strange if Commerce's position here is that the scrap and second-quality pipe should not be included in the duty drawback adjustment because they were not exported.  As Borusan indicates, such a position would effectively constitute a "sea change" on Commerce's part.

Borusan has repeatedly pointed out that, in prior administrative reviews, Commerce has consistently included scrap and second-quality pipe in the company's duty drawback adjustment, even though the company has *never* exported the scrap and second-quality pipe and even though

Borusan's argument based on the 0% duty rate applicable to scrap and second-quality pipe alone

justifies remand to the agency, Commerce's misstatement of Turkish law does as well.

---

the company has *always* sold the scrap and second-quality pipe domestically, on the Turkish market. *See, e.g.*, Borusan's Supp. Questionnaire Responses at C-29; Pl.'s Brief at 32-35; Pl.'s Reply Brief at 20, 21-22.

     Moreover, in an investigation covering a time period more recent than the period of review in this case, Commerce granted Borusan "the duty drawback adjustment as it was reported" by the company – without excluding scrap and second-quality pipe. Issues & Decision Memorandum for the Final Affirmative Determination in the Less than Fair Value Investigation of Certain Oil Country Tubular Goods from the Republic of Turkey at 17 (Comment 1) (July 10, 2014); *see also* Certain Oil Country Tubular Goods From the Republic of Turkey: Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances, in Part, 79 Fed. Reg. 41,971 (July 18, 2014).

     Indeed, Saha Thai – an oft-cited case concerning the duty drawback adjustment – involved a duty drawback adjustment for yield loss, much like the scrap and second-quality pipe at issue here. *See* Saha Thai Steel Pipe (Public) Co., 33 CIT at 1546-49 (rejecting Commerce's decision to use Saha Thai's actual "yield loss factors" – rather than Thai government's standard "yield loss factors" – in calculating company's duty drawback adjustment), *aff'd*, 635 F.3d 1335 (Fed. Cir. 2011); *see generally* Pl.'s Reply Brief at 21 (summarizing Saha Thai and its implications for this case). Nowhere in the decisions in that case is there even a whisper of a hint that yield loss is not to be included in duty drawback adjustments.

     The sheer brevity of Commerce's explanation in the Issues & Decision Memorandum further suggests that Commerce is not making a "sea change" by taking the position that yield loss that is not exported cannot be included in a duty drawback adjustment. "When an agency decides to change course, . . . it must adequately explain the reason for a reversal of policy." Huvis Corp. v. United States, 570 F.3d 1347, 1354 (Fed. Cir. 2009) (quoting Nippon Steel Corp. v. U.S. Int'l Trade Comm'n, 494 F.3d 1371, 1377-78 n.5 (Fed. Cir. 2007)) (internal citations omitted). In circumstances such as those presented here, it would be incumbent upon Commerce to "provide a more detailed justification [for a change in policy or practice] than what would suffice for a new policy [or practice] created on a blank slate." Huvis Corp., 570 F.3d at 1354-55 (citing FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515-16 (2009)); *see also, e.g.*, State Farm, 463 U.S. at 42 (ruling that "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance").

B.  <u>The Arguments of the Government and U.S. Steel</u>

In their briefs, both the Government and U.S. Steel strain to salvage Commerce's determination, maintaining that the agency properly declined to include scrap and second-quality pipe in calculating Borusan's duty drawback adjustment.  *See generally* Def.'s Response Brief at 2, 6, 40-43; Def.-Int.'s Response Brief at 4-6, 9, 23-27.   Their efforts, however, are in vain.

The gravamen of the Government's brief is that Commerce correctly denied Borusan's request for a duty drawback adjustment for scrap and second-quality pipe, due to a "failure of proof."   Specifically, in its brief, the Government asserts that "[t]he record does not support Borsuan's contention" that, under Turkish customs law, the duty rate applicable to scrap and second-quality pipe was 0%.   Def.'s Response Brief at 42; *see also id*. at 2, 6.   While acknowledging that "Borusan *asserted* that the applicable duty rate on scrap and second-quality pipe imported into Turkey was zero," the Government's brief argues that Borusan "did not substantiate its claim with any supporting *evidence*, such as a Turkish tariff schedule that lists the duty rate applicable to imports of scrap and second-quality pipe."   *Id*. at 42-43 (emphases in the original); *see also id*. at 2, 6.   Wholly discounting the certified statements in Borusan's questionnaire responses that "[t]here is no customs import duty in Turkey on steel scrap or second-quality pipe" and that "the import duty on scrap and second quality pipe is zero," the Government's brief asserts that "[c]onclusory statements such as those made by Borusan, do not equate to preponderant evidence."   *Id*. at 43 (citation omitted); *see* Borusan's Initial Questionnaire Responses at C-37; Borusan's Supp. Questionnaire Responses at C-29.[17]

---

[17]As required by Commerce's regulations, like all "submission[s] containing factual information" that respondents file with the agency, all of Borusan's questionnaire responses were

The short answer to the Government's argument is that it is pure, impermissible *post hoc*

rationale.  As discussed elsewhere herein, Commerce's explanation of its determination in the

Issues & Decision Memorandum *does not even mention* the 0% duty rate applicable to scrap and

second-quality pipe.  *See* Issues & Decision Memorandum at 18-19.  Clearly Commerce did not

base its determination on an alleged absence of record evidence substantiating that duty rate.  *See*

Pl.'s Reply Brief at 18-19.

As set forth in section II above, it is well-settled that an agency's determination cannot be

sustained on the basis of a rationale supplied after the fact by litigation counsel.  *See* Burlington

Truck Lines, 371 U.S. at 168-69.  As the Supreme Court has underscored, "an agency's action

must be upheld, if at all, on the basis articulated by the agency itself."  State Farm, 463 U.S. at 50.

The Government's argument therefore must be rejected.[18]

---

filed under certification by both Borusan and its counsel.  *See* 19 C.F.R. § 351.303(g); Borusan's
Initial Questionnaire Responses at 4-5 (Pub. Doc. No. 54) (certifications by Borusan and its
counsel); Borusan's Supp. Questionnaire Responses at 4-5 (same); *see also* Pl.'s Reply Brief at
17, 18.  In their certifications (the precise language of which is dictated by Commerce's
regulations), Borusan and its counsel attested to the accuracy and completeness of all information
provided in the questionnaire responses, under penalty of criminal sanctions for "material false
statements" pursuant to 18 U.S.C. § 1001.  *See* 19 C.F.R. § 351.303(g); Borusan's Initial
Questionnaire Responses at 4-5 (Pub. Doc. No. 54); Borusan's Supp. Questionnaire Responses at
4-5; 18 U.S.C. § 1001; *see also* Pl.'s Reply Brief at 17, 18.

[18]Quite apart from the fact that it constitutes *post hoc* rationale, the argument that the
Government makes in its brief is plagued by a number of other serious infirmities.  As a threshold
matter, although it is true that there is no documentary evidence of the duty rate applicable to scrap
and second-quality pipe in the existing administrative record, the record does include Borusan's
certified questionnaire responses attesting to the fact that the duty rate during the relevant period
was 0%.  *See* Borusan's Initial Questionnaire Responses at C-37; Borusan's Supp. Questionnaire
Responses at C-29.  And, pursuant to Commerce's own regulations, such "statements of fact"
constitute "[e]vidence."  *See* 19 C.F.R. § 351.102(b)(21)(i)-(ii) & (iv)-(v) (2016) (defining
"[e]vidence" as "*including statements of fact*, documents, and data . . . .") (emphasis added).  *See*
*generally* Pl.'s Reply Brief at 17-18 (noting, *inter alia*, that 19 C.F.R. § 351.104(a)(1) specifies

Although it is perhaps a slightly closer call, U.S. Steel's arguments in support of

Commerce's determination also constitute *post hoc* rationale.   For example, U.S. Steel

characterizes the scrap and second-quality pipe at issue as "nonsubject merchandise" and

emphasizes that they were not exported to the U.S., asserting that yield loss that is not exported to

the U.S. cannot be included in a duty drawback adjustment.   *See* Def.-Int.'s Response Brief at 24-

26, 27; *see also id.* at 1, 5, 9.   Contrary to U.S. Steel's implication, however, there is no indication

in the Issues & Decision Memorandum that Commerce focused on the definition of "subject

---

that the administrative record includes "all factual information, written argument, or other material
developed by, presented to, or obtained by the Secretary during the course of a proceeding that
pertains to the proceeding").   It is therefore incorrect to assert that the record here includes no
evidence of the 0% duty rate applicable to scrap and second-quality pipe under Turkish customs
law.

Moreover, the notion that respondents must prove all facts by documentary evidence is
highly impracticable and, in fact, has not been Commerce's practice.   As Borusan puts it,
"respondents . . . make factual statements in response to hundreds of questions and are not required
to submit a separate document substantiating . . . [each and every] factual statement[]."   Pl.'s Reply
Brief at 17-18.

Further, although the Government (and the domestic producer) here wish to discount a
statement in a respondent's certified questionnaire response and accord it no evidentiary weight,
the precedent that they propose to set could be dangerous.   "The shoe will be on the other foot" in
other proceedings, where the agency and the domestic industry will want to rely on such a
statement.   To the extent that they here contend that such certified statements cannot be relied upon
and have no evidentiary value, it would be incongruous (to say the least) for them to seek to rely
on such statements in other proceedings or to seek to hold respondents accountable for them.

In any event, at least in this case, any insistence on documentary proof elevates form over
substance, because the fact at issue is not in dispute.   No one contests Borusan's statement that the
applicable duty rate was 0%.   *See, e.g.,* Def.-Int.'s Response Brief at 25 (acknowledging "the
applicable import duty rate for [scrap and second-quality pipe] established under Turkish customs
laws – *i.e.,* zero percent"); *id.* at 25-26 (arguing that scrap and second-quality pipe are subject to
import duties, "albeit at a zero percent rate").   Indeed, the administrative record here could not
sustain a finding that the applicable duty rate was anything other than 0%.

merchandise" vis-à-vis the scrap and second-quality pipe; and Commerce's explanation in the Issues & Decision Memorandum does not even use the term "nonsubject merchandise." *See* Issues & Decision Memorandum at 18-19.  Further, according to the explanation in the Issues & Decision Memorandum, Commerce's decision to exclude scrap and second-quality pipe from Borusan's duty drawback adjustment did not turn on the fact that the scrap and second-quality pipe were not exported.  Instead, the explanation in the Issues & Decision Memorandum seemingly identifies as the critical factor the fact that the scrap and second-quality pipe were subject to import duty (though, again, the explanation fails to note that the applicable duty rate was 0%).  *See id*.  U.S. Steel cannot put words in Commerce's mouth.

U.S. Steel similarly highlights the fact that Borusan sold the scrap and second-quality pipe domestically, on the Turkish market.  *See* Def.-Int.'s Response Brief at 24-25, 27; *see also id*. at 1, 5, 9.  But Commerce's explanation in the Issues & Decision Memorandum is devoid of any reference to Borusan's domestic sales of scrap and second-quality pipe.  *See* Issues & Decision Memorandum at 18-19.  Thus, according to the agency's own explanation, those domestic sales played no part in Commerce's determination.

Lastly, U.S. Steel advances an argument tracking the language of the statute, which provides for a duty drawback adjustment to account for "the amount of any import duties imposed by the country of exportation . . . which have not been collected[] by reason of the exportation of the subject merchandise to the United States."  *See* Def.-Int.'s Response Brief at 25; 19 U.S.C. § 1677a(c)(1)(B).  Drawing on the statutory text, U.S. Steel concludes that the reason that Borusan pays no import duties on scrap and second-quality pipe is not because of "the exportation of the subject merchandise [here, standard pipe] to the United States," but, rather, because – under

Turkish customs law – the duty rate applicable to scrap and second-quality pipe is 0%.  *See* Def.-Int.'s Response Brief at 25.  However, any such nuanced parsing of the statute is conspicuously absent from Commerce's explanation of its determination in the Issues & Decision Memorandum.  *See* Issues & Decision Memorandum at 18-19.  Whatever the merits of U.S. Steel's statutory analysis, it cannot be credited because it is *post hoc* rationale.

## C.  Proceedings on Remand

Much as in <u>CS Wind Vietnam Co.</u>, "[i]n this case, Commerce has not provided the needed explanation setting forth the interpretations and evidence-based factual findings that establish the required connection from statute to determination."  *See* <u>CS Wind Vietnam Co.</u>, 832 F.3d at 1377.  Remand will permit Commerce "to provide that A-to-Z explanation" that is missing from the existing administrative record.  *Id.*

Some of the questions and uncertainties surrounding Commerce's determination are identified above and others were explored in oral argument.  *See* Audio Recording of Oral Argument (Oct. 8, 2015).  However, "[o]n remand, Commerce's task is not to provide isolated responses" to the questions and concerns that have been specifically identified.  *See* <u>CS Wind Vietnam Co.</u>, 832 F.3d at 1380.  Instead, Commerce must give holistic consideration to the treatment of yield loss in calculating duty drawback adjustments and then "provide a coherent, full explanation" of its practice both in this case in particular and more generally, "laying out and justifying each step so that not only are . . . [the already identified] concerns addressed, but, more broadly, . . . [the court] may see how [Commerce's] ultimate result is grounded in a justified statutory interpretation and the evidence of record."  *Id.*

## IV.  <u>Conclusion</u>

For all the reasons set forth above, Borusan's Motion for Judgment on the Agency Record

must be granted and this matter remanded to the U.S. Department of Commerce for further action

not inconsistent with this opinion.

A separate order will enter accordingly.


<u>/s/ Delissa A. Ridgway</u>
Delissa A. Ridgway
Judge

Dated:  April 20, 2017
        New York, New York